1  **JASON I. SER**
   California State Bar No. 201816
2  FEDERAL DEFENDERS OF SAN DIEGO, INC.
   225 Broadway, Suite 900
3  San Diego, California 92101-5008
   Telephone: (619) 234-8467
4  jason_ser@fd.org

5  Attorneys for Mr. Rendon-Lara

6

7

8                    UNITED STATES DISTRICT COURT

9                    SOUTHERN DISTRICT OF CALIFORNIA

10                   **(HONORABLE JANIS L. SAMMARTINO)**

11  UNITED STATES OF AMERICA,        )  Case No.: 08cr1367-JLS
                                      )
12           Plaintiff,              )  Date:    May 30, 2008
                                      )  Time:    1:30 p.m.
13  v.                                )
                                      )
14  VICTOR HUGO RENDON-LARA,         )  **STATEMENT OF FACTS AND POINTS AND**
                                      )  **AUTHORITIES IN SUPPORT OF MOTIONS**
15           Defendant.              )
                                      )
16  _____)

17                              **I.**

18                    **STATEMENT OF FACTS**[1]

19        Mr. Rendon-Lara incorporates by reference the statement of facts previously provided to the Court.

20  He provides the following statement in support of the instant motion based upon a partial transcription of

21  the videotaped interrogation, which was only recently prepared. That partial transcription is attached hereto

22  as Exhibit A.

23        Some three hours after his arrival at primary inspection, Mr. Rendon-Lara was brought to a small

24  interrogation room, where two Immigration and Customs Enforcement (ICE) Special Agents (Agents

25  Angela Sanchez and Agent Jeff Thompson) were present with him. The interrogation session was

26

27  _____

28        [1] The following statement of facts is based, in part, on materials received from the government. The
    facts alleged in these motions are subject to elaboration and/or modification at the time these motions are
    heard. Mr. Rendon-Lara reserves the right to take a position contrary to the following statement of
    facts at the motions hearing and at trial.

videotaped.  Prior to administering warnings pursuant to <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the officers asked Mr. Rendon-Lara a series of questions pertaining to a variety of information, including biographical.

Agent Sanchez was the lead interrogator and administered the <u>Miranda</u> warnings in the Spanish language as the only Spanish speaking agent.  <u>See</u> Exhibit A at 2.[2]  She began by telling Mr. Rendon-Lara about his right to remain silent and that his statements can be used against him.  <u>Id.</u>  She told him he had the right to consult with a lawyer before questioning.  <u>Id.</u>  She then told him he had "the right to have an attorney present with you during the questioning."  <u>Id.</u>  Immediately thereafter, Mr. Rendon-Lara sought clarification from the agents about his situation and twice asked "Is this the questioning?"  <u>Id.</u>  Agent Sanchez told him "Uh huh" in response to his second question.  <u>Id.</u> at 3.  Ignoring his statement "Well, it would be good, wouldn't it, to have attorney with me", Agent Sanchez simply asked "Do you understand the right?"  <u>Id.</u>  In response, Mr. Rendon-Lara stated as follows:

| | |
|---|---|
| Sanchez: | Do you understand the right? |
| Rendon: | Yes. |
| Sanchez: | Okay. |
| Rendon: | Yes, I need, I do want, I want an attorney. |
| Sanchez: | You want an attorney?  Okay, but right now I just need your initials if you understand the right. |

<u>Id.</u>

Without any break in the session, Agent Sanchez then finishes reading the rights and has Mr. Rendon-Lara confirm that he understood his rights.  <u>Id.</u>  She then tells him what was found in his car, <u>id.</u>, and states "but we want to know, what, what you [can] tell us about that."  <u>Id.</u> at 4.  Agent Sanchez thereafter obtains a waiver from Mr. Rendon-Lara of his <u>Miranda</u> rights, including his right to an attorney that he had invoked only minutes earlier.  <u>Id.</u> at 4-5.

This give and take, which spans several minutes, is reflected in the attached transcript and gives rise to the statements motion below.

---

[2]  Exhibit A is a certified partial transcript from Mr. Rendon-Lara's interrogation.

## II.

### THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE INSTRUCTIONS GIVEN TO THE GRAND JURY FORBID THAT BODY FROM  FULFILLING ITS TRADITIONAL ROLE

The indictment in the instant case was returned by the January 2007 grand jury.  See Reporter's Partial Transcript of the Proceedings (hereafter "Instructions"), dated January 11, 2007.[3]  The instructions deviate, in several ways, from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district.[4]

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, see Instructions at 3, 3-4, 5, this Court instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you." See id. at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, the Court  referred to an instance in the grand juror selection process in which it excused three potential jurors.  See id. at 8.

I've gone over this with a couple of people.  You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

---

[3]  Counsel has attached three exhibits in support of the grand jury related motions.  See Reporter's Partial Transcript of the Proceedings, dated January 11, 2007 (Exhibit B hereto); Reporter's Transcript of Proceedings ("Voir Dire"), dated January 11, 2007 (Exhibit C hereto); United States v. Martinez-Covarrubias, Case No. 07cr0491-BTM (S.D. Cal. Oct. 11, 2007) (order attached hereto as Exhibit D);

[4]  See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

<u>Id.</u> That "principle" was the Court's discussion of the grand jurors' inability to give effect to their disagreement with Congress. <u>See id.</u> at 8-9. Thus, the Court not only instructed the grand jurors on its view of their discretion; it enforced that view on pain of being excused from service as a grand juror.

In addition to its instructions on the authority to choose not to indict, the Court also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. <u>See</u> <u>id.</u> at 20.

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.

<u>Id.</u> (emphasis added). The Court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." <u>See id.</u> at 27.

Mr. Rendon-Lara was indicted by the January 2007 grand jury on April 30, 2008.

**A.**    ***Navarro-Vargas* Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury.**

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California. <u>See</u> <u>Navarro-Vargas II</u>, 408 F.3d 1184. While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic approach[5] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases. The Court's instructions cannot be reconciled with the role of the grand jury as set forth in <u>Navarro-Vargas II</u>.

For instance, with respect to the grand jury's relationship with the prosecution, the <u>Navarro-Vargas II</u> majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

---

[5]  <u>See</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

1    deciding whether a particular prosecution shall be instituted or followed up, performs much the same

2    function as a grand jury.'" Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478,

3    510 (1978)).    Accord Navarro-Vargas I, 367 F.3d at 900 (Kozinski, J., dissenting) (The grand jury's

4    discretion in this regard "is most accurately described as prosecutorial." ).  See also Navarro-Vargas II, 408

5    F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that the prosecutor is not obligated to proceed on any

6    indictment or presentment returned by a grand jury, id., but also that "the grand jury has no obligation to

7    prepare a presentment or to return an indictment drafted by the prosecutor."  Id.  See Niki Kuckes, The

8    Democratic Prosecutor:  Explaining the Constitutional Function of the Federal Grand Jury, 94 Geo. L.J.

9    1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important attribute

10   of grand jury review from the perspective of those who insisted that a grand jury clause be included in the

11   Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure § 15.2(g) (2d ed. 1999)).

12       Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth

13   in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

14       The grand jury thus determines not only whether probable cause exists, but also whether to
         "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps
15       most significant of all, a capital offense or a non-capital offense -- all on the basis of the
         same facts.  And, significantly, the grand jury may refuse to return an indictment even
16       "'where a conviction can be obtained.'"

17   Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's description of

18   the grand jury's attributes in  Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury

19   "controls not only the initial decision to indict, but also significant questions such as how many counts to

20   charge and whether to charge a greater or lesser offense, including the important decision whether to charge

21   a capital crime."  Id. at 399 (citing Vasquez, 474 U.S. at 263).

22       Judge Hawkins notes that the Navarro-Vargas II majority accepts the major premise of Vasquez: "the

23   majority agrees that a grand jury has the power to refuse to indict someone even when the prosecutor has

24   established probable cause that this individual has committed a crime."  See id. at 1214 (Hawkins, J.

25   dissenting).  Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J., dissenting); Marcucci, 299 F.3d at

26   1166-73 (Hawkins, J., dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support

27   in the Ninth Circuit.  But not in the instructions.

28

1

2

**B.    The Instructions Forbid the Exercise of Grand Jury Discretion Established in Both**
**     *Vasquez* and *Navarro-Vargas II*.**

3    The *Navarro-Vargas II* majority found that the instruction in that case "leave[s] room for the grand

4    jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous

5    decision in Marcucci.  Marcucci reasoned that the instructions do not mandate that grand jurors indict upon

6    every finding of probable cause because the term "should" may mean "what is probable or expected."  299

7    F.3d at 1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge

8    Hawkins ably pointed out.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The

9    instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or

10   obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").  See

11   also id. ("The 'word' should is used to express a duty [or] obligation.") (quoting The Oxford American

12   Diction and Language Guide 1579 (1999) (brackets in original)).

13   The debate about what the word "should" means is irrelevant here; the instructions here make no

14   such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not

15   choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

16   disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against

17   indicting even though I think that the evidence is sufficient'...."  See Instructions at 8-9.  Thus, the

18   instruction flatly bars the grand jury from declining to indict because they disagree with a proposed

19   prosecution. No grand juror would read this language as instructing, or even allowing, him or her to assess

20   "the need to indict." Vasquez, 474 U.S. at 264.

21   Nor does the Navarro-Vargas II majority's faith in the structure of the grand jury a cure for the

22   instructions excesses.  The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its

23   independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its

24   decisions." 408 F.3d at 1200.  As a result, the majority discounts the effect that a judge's instructions may

25   have on a grand jury because "it is the structure of the grand jury process and its function that make it

26   independent." Id. at 1202 (emphases in the original).

27   Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes that the

28   'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

of many of its decisions -- sufficiently protects that power." See id. at 1214 (Hawkins, J., dissenting). The flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond making a probable cause determination ... unconstitutionally undermines the very structural protections that the majority believes save[] the instruction." Id. After all, it is an "'almost invariable assumption of the law that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)). If that "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described in Vasquez. Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous instructions because nothing will happen if they disobey them." Id.

In setting forth Judge Hawkins' views, Mr. Rendon-Lara understands that the Court may not adopt them solely because the reasoning that supports them is so much more persuasive than the majority's sophistry. Rather, he sets them forth to urge the Court not to extend what is already untenable reasoning.

Here, again, the question is not an obscure interpretation of the word "should", but an absolute ban on the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and both Navarro-Vargas II opinions. Navarro-Vargas II is distinguishable on that basis, but not only that.

The Court's interactions with two potential grand jurors who indicated that, in some unknown set of circumstances, they might decline to indict even where there was probable cause, emphasize this mistaken view of grand jury discretion. Because of the redactions of the grand jurors' names, Mr. Rendon-Lara will refer to them by occupation. One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA). The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not an effective use of resources. See Voir Dire Transcript at 16. The CSW was also troubled by certain unspecified immigration cases. See id.

The Court did not determine what sorts of drug and immigration cases troubled the CSW. It never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling. Rather, he provided instructions suggesting that, in any event, any scruples LCW may have possessed were simply not capable of expression in the context of grand jury service.

> Now, the question is can you fairly evaluate [drug cases and immigration cases]? Just as the defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States

1   entitled to a fair judgment.  If there's probable cause, then the case should go forward.  I
2   wouldn't want you to say, "well, yeah, there's probable cause, but I still don't like what our
    government is doing.  I disagree with these laws, so I'm not going to vote for it to go
3   forward."  If that is your frame of mind, the probably you shouldn't serve.  Only you can tell
    me that.

4   See id. at 16-17 (emphasis added).  Thus, without any sort of context whatsoever, the Court let the grand

5   juror know that he would not want him or her to decline to indict in an individual case where the grand juror

6   "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause.  See id.

7   Such a case "should go forward."  See id.  Given that blanket proscription on grand juror discretion, made

8   manifest by the Court's use of the pronoun "I", the CSW indicated that it "would be difficult to support a

9   charge even if [the CSW] thought the evidence warranted it."  See id.  Again, the Court's question provided

10  no context; it inquired regarding "a case," a term presumably just as applicable to possession of a small

11  amount of medical marijuana as kilogram quantities of methamphetamine for distribution.  Any grand juror

12  listening to this exchange could only conclude that there was no case in which the Court would permit them

13  to vote "no bill" in the face of a showing probable cause.

14      That same point was emphasized in the Court's exchange with REA.  REA first advised the Court

15  of a concern regarding the "disparity between state and federal law" regarding "medical marijuana."  See

16  id. at 24.  The Court first sought to address REA's concerns about medical marijuana by stating that grand

17  jurors, like trial jurors, are simply forbidden from taking penalty considerations into account.

18      Well, those things -- the consequences of your determination shouldn't concern you in the
        sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they
19      cannot consider the punishment or the consequence that Congress has set for these things.
        We'd ask you to also abide by that.  We want you to make a business-like decision of
20      whether there was a probable cause. ...

21  Id. at 24-25.  Having stated that REA was to "abide" by the instruction given to trial jurors, the Court went

22  on to suggest that REA recuse him or herself from medical marijuana cases.  See id. at 25.

23      In response to further questioning, REA disclosed REA's belief "that drugs should be legal."  See

24  id.  That disclosure prompted the Court to begin a discussion that ultimately led to an instruction that a

25  grand juror is obligated to vote to indict if there is probable cause.

26      I can tell you sometimes I don't agree with some of the legal decisions that are indicated that
        I have to make.  But my alternative is to vote for someone different, vote for someone that
27      supports the policies I support and get the law changed.  It's not for me to say, "well, I don't
        like it.  So I'm not going to follow it here."
28

1    You'd have a similar obligation as a grand juror even though you might have to grit your
     teeth on some cases. Philosophically, if you were a member of congress, you'd vote against,
2    for example, criminalizing marijuana. I don't know if that's it, but you'd vote against
     criminalizing some drugs.
3    That's not what your prerogative is here. You're prerogative instead is to act like a judge and
     say, "all right. This is what I've to deal with objectively. Does it seem to me that a crime
4    was committed? Yes. Does it seem to me that this person's involved? It does." And then
     your obligation, if you find those to be true, would be to vote in favor of the case going
5    forward.

6    Id. at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test, which, if

7    both questions are answered in the affirmative, lead to an "obligation" to indict.

8         Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that

9    paradigm, the Court reinforced the "obligation" to indict in every case in which there was probable cause.

10   The Court:    Do you think you'd be inclined to let people go in drug cases even though
                   you were convinced there was probable cause they committed a drug
11                 offense?
     REA:          It would depend on the case.
12   The Court:    Is there a chance that you would do that?
     REA:          Yes.
13   The Court:    I appreciate your answers. I'll excuse you at this time.

14   Id. at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act solely on his

15   political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as

16   it should. Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote

17   to indict in some (perhaps many or even nearly all) cases in which there was probable cause. Again, the

18   Court did not explore REA's views; it did not ascertain what sorts of cases would prompt REA to hesitate.

19   The message is clear: it does not matter what type of case might prompt REA's reluctance to indict because,

20   once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward." See id.

21   at 27. That is why even the "chance," see id., that a grand juror might not vote to indict was too great a risk

22   to run.

23        The structure of the grand jury and the secrecy of its deliberations cannot embolden grand jurors who

24   are no longer serving, apparently because they expressed their willingness to act as the conscience of the

25   community. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury exercising

26   its powers under Vasquez "serves ... to protect the accused from the other branches of government by acting

27   as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 & n.6 (D.C.

28   Cir. 1969)). The federal courts possess only "very limited" power "to fashion, on their own initiative, rules

1   of grand jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and, here, the Court has both

2   fashioned his own rules and enforced them. The instructions here are therefore structural error. See

3   Navarro-Vargas II, 408 at 1216-17 (Hawkins, J., dissenting). The indictment must be dismissed.

4       Nor can the word games played by the Navarro-Vargas II and Marcucci majorities save the

5   instructions: in their entirety, the instructions here prohibited the grand jury from exercising the discretion

6   established in both Vasquez and Navarro-Vargas II, specifically the discretion to not indict even if the grand

7   jury finds probable cause. See Vasquez, 474 U.S. at 264; Navarro-Vargas II, 408 F.3d at 1200. As noted

8   above, because the model charge "does not state that the jury 'must' or 'shall' indict, but merely that it

9   'should' indict if it finds probable cause," Navarro-Vargas II held that the model instruction did not violate

10  the grand jury's independence. See 408 F.3d at 1205. Resort to that unlikely reading of the word "should"

11  is to no avail here.

12      It is true that on several occasions, the Court used the word "should" instead of "shall" with respect

13  to whether an indictment was required if probable cause existed. In context, however, it is clear that he

14  could only mean "should" in the obligatory sense. For example, when addressing a prospective juror, the

15  Court not only told the jurors that they "should" indict if there is probable cause, it told them that if there

16  is not probable cause, "then the grand jury should hesitate and not indict." See Voir Dire at 8. At least in

17  context, it would strain credulity to suggest that the Court was using "should" for the purpose of "leaving

18  room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas II, 408 F.3d

19  at 1205.

20      The full passage cited above effectively eliminates any possibility that the Court intended the

21  Navarro-Vargas II spin on the word "should."

22      [T]he grand jury is determining really two factors: "do we have a reasonable belief that a
        crime was committed? And second, do we have a reasonable belief that the person that they
23      propose that we indict committed the crime?"
        If the answer is "yes" to both of those, then the case should move forward. If the answer to
24      either of the questions is "no," then the grand jury should not hesitate and not indict.

25  See Voir Dire at 8. Of the two sentences containing the word "should," the latter of the two essentially

26  states that if there is no probable cause, you should not indict. The Court could not possibly have intended

27  to "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas II,

28  408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159). That would contravene the grand jury's historic role

                                    10                                    08cr1367-JLS

1  of protecting the innocent.  See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's

2  "responsibilities continue to include both the determination whether there is probable cause and the

3  protection of citizens against unfounded criminal prosecutions.") (citation omitted).

4      By the same token, if the Court said that "the case should move forward" if there is probable cause,

5  but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see Navarro-

6  Vargas II, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then it would have to have intended two

7  different meanings of the word "should" in the space of two consecutive sentences.  That could not have

8  been the Court's intent.  But even if it were, no grand jury could ever have had that understanding.  Jurors

9  are not presumed to be capable of sorting through internally contradictory instructions.  See generally

10  United States v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court

11  cannot presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

12  Finally, even if a juror could somehow latch onto some tenuous claim of ambiguity in the word "should,"

13  the Court eliminated any sort of permissive construction by advising the grand jurors of the "obligation" to

14  indict if there is probable cause.  See Voir Dire at 26-27.

**C.    The Instructions Conflict With _Williams_' Holding that there Is No Duty to Present Exculpatory Evidence to the Grand Jury.**

17      In Williams, the defendant, although conceding that it was not required by the Fifth Amendment,

18  argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

19  exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

20  common law.  See 504 U.S. at 45, 51.  Williams held that "as a general matter at least, no such 'supervisory'

21  judicial authority exists."  See id. at 47.  Indeed, although the supervisory power may provide the authority

22  "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

23  amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by the

24  Court and by Congress to ensure the integrity of the grand jury's functions,'" id. at 46 (citation omitted), it

25  does not serve as "a means of prescribing such standards of prosecutorial conduct in the first instance."  Id.

26  at 47 (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own

27  initiative, rules of grand jury procedure."  Id. at 50.  As a consequence, Williams rejected the defendant's

28  claim, both as an exercise of supervisory power and as Fifth Amendment common law.  See id. at 51-55.

Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  <u>See</u> Instructions at 20.

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury.  You're all about probable cause.  If you think that there's evidence out there that might cause you say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well.  As I told you, in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.

<u>Id.</u> (emphasis added).  Moreover, the Court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you."  <u>See</u> <u>id.</u> at 27.

This particular instruction has a devastating effect on the grand jury's protective powers, particularly if it is not true.  It begins by emphasizing the message that <u>Navarro-Vargas II</u> somehow concluded was not conveyed by the previous instruction: "You're all about probable cause."  <u>See</u> <u>id.</u> at 20.  Thus, once again, the grand jury is reminded that they are limited to probable cause determinations.  The instruction goes on to tell the grand jurors that they should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor will present it.  The end result, then, is that grand jurors should consider evidence that goes against probable cause, but, if none is presented by the government, they can  presume that there is none.  After all, "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence."  <u>See</u> <u>id.</u>  Thus, if the exculpatory evidence existed, it necessarily would have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you."  <u>See</u> <u>id.</u> at 27.

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

> (1)    I have to consider evidence that undercuts probable cause.
> (2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.
> (3)    Because no such evidence was presented to me, I may conclude that there is none.

Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound prosecutor would have presented it.

The instructions therefore discourage investigation -- if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time -- and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

**D.    The Absolute Prohibition on Consideration of Penalty Information Violates *Vasquez*.**

The instructions advise the grand jurors that they are forbidden from considering the penalties to which indicted persons may be subject.

> Prospective Juror (REA):  ... And as far as being fair, it kind of depends on what the case is about because there is a disparity between state and federal law.
> The Court:        In what regard?
> Prospective Juror:    Specifically, medical marijuana.
> The Court:        Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things.  We'd ask you to also abide by that.  We want you to make a business-like decision of whether there was a probable cause. ...

See Voir Dire at 24-25.  A "business-like decision of whether there was a probable cause" would obviously leave no role for the consideration of penalty information.

The Ninth Circuit previously rejected a claim based upon the proscription against consideration of penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See Cortez-Rivera, 454 F.3d at 1040-41.  Cortez-Rivera is inapposite for two reasons.  First, the Court did not use the term "should" in the passage quoted above.  Second, that context, as well as the Court's consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there ever was any) relied upon by Cortez-Rivera.  The instructions again violate Vasquez, which plainly authorized consideration of penalty information.  See 474 U.S. at 263.

**E.    The Errors Are Structural.**

The errors here are constitutional: Mr. Rendon-Lara is entitled to the "traditional functioning of the institution that the Fifth Amendment demands," see Williams, 504 U.S. at 51, and the instructions do not permit the grand jury to perform its function as is demonstrated by the instructions' many conflicts with Vasquez.    That error is structural.    See Navarros-Vargas, 408 F.3d at 1214, 1216-17 (Hawkins, J., dissenting). Accord Navarros-Vargas, 367 F.3d at 903 (Kozinski, J., dissenting).[6] Nevertheless, even were the Court restricted to exercising its supervisory powers, the decision to excuse at least two grand jurors created the necessary prejudice to warrant dismissal.

**III.**

**THIS COURT SHOULD ORDER PRODUCTION OF THE GRAND JURY TRANSCRIPTS**

**A.    Introduction.**

Judge Moskowitz has ruled on a motion similar to that filed by Mr. Rendon-Lara. See United States v. Martinez-Covarrubias, Case No. 07cr0491-BTM, Order Denying Defendant's Motion to Dismiss the Indictment, dated October 11, 2007 (hereinafter "Order"). While Mr. Rendon-Lara disagrees with Judge Moskowitz's analysis, Judge Moskowitz at least recognizes that the instruction cited above is error, although he incorrectly found that it was not structural. See Order at 11. Because, under Judge Moskowitz's analysis, this Court must determine whether the error was harmless, Mr. Rendon-Lara files the instant motion to produce the transcripts of the grand jury proceedings that resulted in the instant indictment.

**B.    The Court Should Order Disclosure of All Grand Jury Transcripts Because Mr. Rendon-Lara's Exculpatory Statements Are Facts That Cut Against the Government's Request That the Grand Jury Indict Him.**

The Court may order disclosure of grand jury proceedings "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). The Ninth Circuit requires a "particularized need" to justify disclosure, see United States v. Walczak, 785 F.2d 852, 857 (9th Cir. 1986), but that need cannot be any different than the

---

[6] Because the Navarro-Vargas II majority found no error in the form instruction given, and not modified, in that case, the majority had no occasion to address the structural error analyses in Judge Hawkins' and Judge Kozinski's dissents. The Court may therefore rely upon them as the persuasive authority of six Ninth Circuit judges.

1   standard set forth in Rule 6(e)(3)(E)(ii): Mr. Rendon-Lara need only show that "a ground may exist to

2   dismiss the indictment because of a matter that occurred before the grand jury." FED. R. CRIM. P.

3   6(e)(3)(E)(ii) (emphasis added). That is why the Rule's "general suggestion [is] in favor of disclosure." See

4   Walczak, 785 F.2d at 857. Here, under Judge Moskowtiz's approach to the Court's instruction, it is clear

5   that, at the very least, "a ground may exist to dismiss the indictment because of a matter that occurred before

6   the grand jury." FED. R. CRIM. P. 6(e)(3)(E)(ii) (emphasis added).

7          Again, the Court instructed the grand jury that "in most instances, the U.S. Attorneys are duty-bound

8   to present evidence that cuts against what they may be asking you to do if they're aware of that evidence."

9   Instructions at 20. According to Judge Moskowitz, "if Defendant can establish that the Government in fact

10  knew of exculpatory evidence that was not presented to the grand jury and that this failure to present

11  exculpatory evidence, in conjunction with Judge Burns' comments, 'substantially influenced the grand jury's

12  decision to indict' or raises 'grave doubt' that the decision to indict was free of the substantial influence of

13  such events, the Court may dismiss the indictment under its supervisory powers." See Order at 11-12.

14  Because he assigned that burden to defendant Martinez-Covarrubias, he granted Mr. Martinez-Covarrubias

15  "leave to conduct discovery regarding what evidence was presented to the grand jury." See id. at 12. This

16  Court should do the same here.

17         Indeed, there is even more reason to do so here.  The Martinez-Covarrubias Order cites no

18  exculpatory information. But here, the government well knew that Mr. Rendon-Lara denied liability for the

19  offense upon which the government sought indictment.

20         Similarly, the facts that Mr. Rendon-Lara denied knowledge and lacked any record are just the sorts

21  of facts that a grand jury would be likely to consider in deciding whether to exercise its power not to indict.

22         The grand jury does not determine only that probable cause exists to believe that a defendant
       committed a crime, or that it does not.  In the hands of the grand jury lies the power to
23     charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps
       most significant of all, a capital offense or a non-capital offense – all on the basis of the same
24     facts.  Moreover, "[t]he grand jury is not bound to indict in every case where a conviction
       can be obtained."
25

26  Vasquez, 474 U.S. at 263 (citation omitted).  Thus, there are at least two theories under which this evidence

27  "cuts against" the government's request for an indictment as to Mr. Rendon-Lara.

28

1    Because the "particularized need" standard, see Walczak, 785 F.2d at 857, requires no more than a

2    showing "a ground may exist to dismiss the indictment because of a matter that occurred before the grand

3    jury," FED. R. CRIM. P. 6(e)(3)(E)(ii) (emphasis added), and because the Rule's "general suggestion [is] in

4    favor of disclosure," see Walczak, 785 F.2d at 857, this Court should order disclosure in order to permit

5    Mr. Rendon-Lara to meet his burden under Judge Moskowitz's approach.  See Order at 12.

6                                                    **IV.**

7    **THIS COURT SHOULD DISMISS THE INDICTMENT BECAUSE THE "CONTRARY TO
     LAW" LANGUAGE OF 18 U.S.C. § 545 IS UNCONSTITUTIONALLY VAGUE**

8

9            Title 18 U.S.C. § 545, Smuggling Goods Into the United States, provides in relevant part that

10   "Whoever . . . knowingly imports or brings into the United States, any merchandise **contrary to law** . .

11   .[s]hall be fined under this title or imprisoned not more than five years, or both." [Emphasis added].  The

12   general principles of the void-for-vagueness doctrine make it clear that 18 U.S.C. § 545 is constitutionally

13   deficient.  The Supreme Court has held that this doctrine "requires that a penal statute define the criminal

14   offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in

15   a manner that does not encourage arbitrary and discriminatory enforcement.  Kolender v. Lawson, 461 U.S.

16   352, 357 (1983) (refusing to give effect to a California statute that required loiterers to provide "credible

17   and reliable" identification to police officers).  In Kolender, Justice O'Connor emphasized that the void-for-

18   vagueness doctrine focuses on "'the requirement that a legislature establish minimal guidelines to govern

19   law enforcement.'"  Id. at 358 (citations omitted).  When "the legislature fails to provide such minimal

20   guidelines, a criminal statute may permit 'a standardless sweep that allows policemen, prosecutors, and

21   juries to pursue their personal predilections.'"  Id. (citations omitted).  Here, it is unclear from the language

22   of 18 U.S.C. § 545 what type of violation would qualify under the "contrary to law" language of the statute.[7]

23           Section 545's "contrary to law" provision is so broad and vague that it does not put a reasonable

24   person on notice of what it forbids.  The notice requirement of the Due Process Clause entitles all

25   _____

26           [7] According to Olais-Castro v. United States, 416 F.2d 1155 n.8 (9th Cir. 1969) (citation omitted),
     the phrase "contrary to law" means "contrary to any existing law."  Indeed, in Olais-Castro, the Ninth

27   Circuit  noted that because "contrary to law" means any existing law, it is not sufficient to allege a
     violation of § 545--rather an indictment must identify, with particularity, the statute alleged to have been

28   violated.  Id.

                                                      16                                    08cr1367-JLS

1   individuals "to be informed as to what the State commands or forbids." Lanzetta v. New Jersey, 306 U.S.

2   451, 453 (1939). The requirement of notice is "[e]ngrained in our concept of due process." Lambert v.

3   California, 355 U.S. 225, 228 (1957).   Accordingly, the Due Process Clause requires that "'no man shall

4   be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'"

5   Bouie v. City of Columbia, 378 U.S. 347, 351 (1964) (quoting United States v. Harriss, 347 U.S. 612, 617

6   (1954)).   Moreover, the fair notice requirement of the Due Process Clause mandates "that a penal statute

7   define the criminal offense with sufficient definiteness that ordinary people can understand what conduct

8   is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender

9   v. Lawson, 461 U.S. 352, 357 (1983). The "purpose of the fair notice requirement is to enable the ordinary

10  citizen to conform his or her conduct to the law," and to allow for the reasonable exercise of the police

11  power by limiting the reach of statutes that might otherwise proscribe innocent conduct. City of Chicago

12  v. Morales, 527 U.S. 41, 46, 58 (1999).

13          In the case presently before this Court, the government is alleging that Mr. Rendon-Lara has violated

14  section 545 by violating 19 U.S.C. § 1461 in that he failed to present for inspection and declare the

15  merchandise. Titles 19 U.S.C. § 1461, however, has its own penalty provisions, specifically forfeiture and

16  fines, embodied in 19 U.S.C. §§ 1436, 1462 and 1595a.  Here, the government is attempting to bootstrap

17  the penalties provided for in section 545 onto a violation of section 1461.  Congress could not have intended

18  such a result.  Nevertheless, the government is exploiting the unconstitutionally vague language of section

19  545 to achieve this unjust result.  If the government were allowed to use the unconstitutionally vague

20  language in section 545 to bootstrap the penalties associated with section 545, the results would be extreme.

21  For example,  hypothetically Mr. Rendon-Lara could be charged with a violation of 18 U.S.C. § 545 if he

22  walked across the border, naked, with the bag of iodine, but nevertheless presented himself and the iodine

23  for inspection.  If "contrary to law" truly means "contrary to any law," then section 545 is so vague that it

24  could even permit Mr. Rendon-Lara to be charged with having offended that section by virtue of committing

25  the misdemeanor violation of California Penal Code section 314, "Indecent Exposure."  See Olais-Castro,

26  416 F.2d at 1158 n.8; see also Andreiu v. Ashcroft, 253 F.3d 477, 489-490 (9th Cir. 2000) (en banc)

27  (Beezer, J., concurring) (defining the term "contrary to law" to refer to **any** existing law).  Moreover, section

28  545 is unconstitutionally vague in that it does not provide "sufficient definiteness that ordinary people can

understand what conduct is prohibited" as articulated in <u>Kolender</u>.  For example, because there are no reporting requirement for iodine (and because iodine possession is not illegal under federal or California law), a reasonable person would not be on notice that bringing it into the United States is illegal (or indeed, what steps he or she must take to make such importation legal).

Moreover, the vagueness of the scope of section 545 practically invites "arbitrary and discriminatory enforcement" as feared by the Supreme Court.  The requirements of customs law are complex.  The government exploits those hyper-technical requirements of customs law in order to charge defendants who bring in substances which are absolutely legal to import but whose importation is objected to by the executive branch  through the U.S. Attorney's office.

Accordingly, the indictment should be dismissed.

V.

**THE INDICTMENT MUST BE DISMISSED BECAUSE 18 U.S.C. § 545 IS UNCONSTITUTIONAL**

**A.    Introduction.**

Title 18 U.S.C. § 545 provides in pertinent part:

Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law–

Shall be fined under this title or imprisoned not more than five years, or both.

*Proof of defendant's possession of such goods, unless explained to the satisfaction of the jury, shall be deemed evidence sufficient to authorize conviction for violation of this section.*

18 U.S.C. § 545 (emphasis added).  This statute is unconstitutional in many respects.

**B.    Section 545 Unconstitutionally Shifts the Burden of Proof.**

The government bears the burden of proving every element of  a criminal offense beyond a reasonable doubt.  <u>In re Winship</u>, 397 U.S. 358 (1970).  If a defense negates an element of the offense, it is unconstitutional to place the burden of proof on the defendant as to that defense.  <u>Patterson v. New York</u>, 432 U.S. 197 (1977).  Section 545 violates the Supreme Court's bedrock rulings in <u>In re Winship</u>, 397 U.S. 358 (1970) and <u>Mullaney v. Wilbur</u>, 421 U.S. 684 (1975).

1    In <u>Winship</u>, the Court recognized the government has the burden of proving every element of a

2  criminal offense beyond a reasonable doubt.  <u>Winship</u>, 397 U.S. at 364.  In <u>Mullaney</u>, the Court further

3  recognized it would violate due process to shift the burden of proof as to an affirmative defense (or a

4  mitigating factor) to a criminal defendant when such burden-shifting functioned to relieve the government

5  from proving every element of the charged offense beyond a reasonable doubt.  <u>Mullaney</u>, 421 U.S. at 698-

6  701.

7    <u>Mullaney</u> involved a Maine statute under which a person accused of murder could rebut the statutory

8  presumption he committed the offense with "malice aforethought" by proving he acted in the heat of passion

9  on sudden provocation.  <u>Id.</u> at 685-87.  Once the state had proved beyond a reasonable doubt the killing was

10 unlawful and intentional, the defendant could come forward with a "heat of passion" defense.  <u>Id.</u>  The Court

11 found the Maine statute constituted an impermissible shifting of the burdens of proof and struck down the

12 statute.  <u>Id.</u> at 703-04.[8]

13    Section 545, likewise, is unconstitutional.  Section 545 mandates that mere possession is sufficient

14 for the jury to infer guilt, unless the defendant "explain[s] to the satisfaction of the jury" why he or she is

15 not guilty.  That language does two constitutionally impermissible things:  1) it shifts the burden of proof

16 to a defendant and 2) relieves the government of having to prove every element of the offense beyond a

17 reasonable doubt.  In fact, the statute explicitly does so.  "Proof of defendant's possession of such goods,

18 unless explained to the satisfaction of the jury, shall be deemed evidence sufficient to authorize conviction

19

20

21

22

23

24

---

25    [8] <u>But see</u>, <u>Patterson v. New York</u>, 432 U.S. 197 (1977).  At issue in <u>Patterson</u>, was a New York law
   which placed the burden on a defendant charged with murder of proving extreme emotional distress (a
26  mitigating factor which would reduce the charge from murder to manslaughter).  <u>Patterson</u> upheld the
   New York law, concluding the state was not relieved from its obligation to prove every element beyond
27  a reasonable doubt.  <u>Patterson</u>, 197 U.S. at 206-07.  The extreme emotional distress defense was a state-
   created (non-constitutional) defense, which did not negate any of the elements of the offense the state
28  would otherwise have to prove.  <u>Id.</u>

1  for violation of this section." 18 U.S.C. § 545.[2]  This is burden-shifting is impermissible under <u>Winship</u> and

2  <u>Mullaney</u>.

3        Relying on the Supreme Court's jurisprudence, the First Circuit has already declared § 545's burden-

4  shifting provision unconstitutional.  <u>United States v. Kenaan</u>, 496 F.2d 181, 183-84 (1st Cir. 1974)

5  (reversing and remanding for new trial because of § 545's unconstitutional burden-shifting language); see

6  <u>Turner v. United States</u>, 396 U.S. 398 (1970) (declaring unconstitutional 21 U.S.C. § 174 because of

7  presumption that mere unexplained possession of cocaine showed knowing importation of cocaine); <u>Leary</u>

8  <u>v. United States</u>, 395 U.S. 6 (1969) (declaring unconstitutional a former importation statute's presumption

9  which allowed juries to infer — from defendant's mere possession of marijuana — marijuana had been

10  illegally imported).

11  **C.     Section 545 Is Unconstitutionally Vague.**

12        Section 545 is unconstitutionally vague because it does not articulate what standard of proof a

13  defendant must satisfy to meet his or her burden of proof.  The statute also does not articulate what sort of

14  evidence the defendant must produce to "explain to the satisfaction of the jury," so that he may negate the

15  presumption of guilt.

16        Here, § 545 requires that a jury to convict Mr. Rendon-Lara unless he can "explain to the satisfaction

17  of the jury" his innocence.  However, the statute is silent as to what Mr. Rendon-Lara would need to show

18  to "satisfy the jury," that it should not convict him.  In contrast, guilt must be established beyond a

19  reasonable doubt.

20        Even in the affirmative defense context, once a defendant comes forward with a prima facie showing

21  sufficient to submit the defense to the jury, the government must disprove at least one element of the defense

22  beyond a reasonable doubt.  For example, when a defendant raises a claim of self-defense, the government

23

24

25

26

27

28

     [2] The government may argue that section 545 does not explicitly shift the burden but that interpretation clearly would be wrong. In <u>Barone v. United States</u>, the Ninth Circuit interpreted the exact same language in § 545's precursor statute.  Holding that that language was unconstitutional the Court held: "This statute is valid and placed upon the defendant the burden of proving his innocence, once the government has established his possession of the incriminating articles."  <u>Barone v. United States</u>, 94 F.2nd 902 (9th Cir. 1938).  This holding, of course, predated <u>Winship</u> and <u>Mullaney</u> and in light of recent Supreme Court jurisprudence, is clearly wrong.

bears the burden of disproving self-defense beyond a reasonable doubt. <u>United States v. Sanchez-Lima</u>, 161 F.3d 545, 549 (9th Cir. 1998); <u>see also</u> <u>Jacobson v. United States</u>, 503 U.S. 540, 549 (1992) (requiring the government to disprove entrapment beyond a reasonable doubt once the defendant has made a prima facie showing of entrapment); <u>United States v. Barry</u>, 814 F.2d 1400 (9th Cir. 1987).

### D.  Section 545's Burden Shifting Violates Mr. Rendon-Lara's Constitutional Right to Remain Silent and Not Have His Silence Used Against Him.

Section 545 initially sets forth a specific-intent standard of "knowledge" that an importation is done "contrary to law." The statute then requires that the jury find the defendant guilty based on mere possession alone unless the defendant explains away the guilty presumption.

Defendants, however, have a Constitutional right to remain silent. U.S. CONST. AMEND V. The government cannot use a defendant's silence against that defendant at trial. <u>See</u> <u>Doyle v. Ohio</u>, 426 U.S. 610, 618 (1976) (the Fifth Amendment's right to be free from self-incrimination guarantees a defendant's silence will not be used against her or her at trial). Thus, § 545 is unconstitutional because it impermissibly forces Mr. Rendon-Lara to choose between two constitutional rights (i.e., a defendant's right against self-incrimination and a defendant's right to force the government to prove guilty beyond a reasonable doubt). <u>See</u> <u>Simmons v. United States</u>, 390 U.S. 377, 393-94 (1968) (it is a fundamental axiom of constitutional jurisprudence that a defendant should not be required to surrender one constitutional right in order to exercise another); <u>see also</u> <u>United States v. Hubbell</u>, 530 U.S. 27, 43 (2000) (the Fifth Amendment privilege against self-incrimination extends to the production of documents, not just testimony).

## VI.

## <u>THE INDICTMENT SHOULD BE DISMISSED BECAUSE IT IS DEFECTIVE</u>

### A.  Introduction.

The single count of the indictment charges:

On or about April 3, 2008, within the Southern District of California, defendant VICTOR HUGO RENDON-LARA did knowingly and intentionally import and bring into the United States from Mexico certain merchandise, to wit, approximately 102.85 kilograms (approximately 226.27 pounds) of iodine, contrary to law, in that said merchandise had not been presented for inspection and declared as provided by Title 19, United States Code, Section 1461; in violation of Title 18, United States Code, Section 545.

1   This count is defective, and should be dismissed, for several reasons: (1) the indictment fails to allege the

2   proper *mens rea*; (2) the indictment fails to state an offense; (3) the indictment violates due process; and (4)

3   the indictment is duplicitous or, at a minimum, requires elections by the government prior to trial.

4   **B.     The Indictment Must Be Dismissed Because it Fails to Allege the Proper *Mens Rea*.**

5          The indictment alleges that Mr. Rendon-Lara knowingly and intentionally imported and brought

6   merchandise into the United States, and that Mr. Rendon-Lara violated United States Customs law, i.e., 19

7   U.S.C. § 1461.  In the indictment, however, the government does not allege that Mr. Rendon-Lara **knew**

8   **that his *importation* was contrary to law**.  Because the indictment fails to allege the proper *mens rea* it is

9   invalid and must be dismissed.  See United States v. Du Bo, 186 F.3d 1177, 1179 (9th Cir. 1999) ("The Fifth

10  Amendment . . . requires that a defendant be convicted only on charges considered and found by a grand

11  jury").

12         The relevant portion of section 545 provides that "Whoever fraudulently or knowingly imports or

13  brings into the United States, any merchandise contrary to law,...shall be fined under this title or

14  imprisoned...."  18 U.S.C. § 545.  Although the language of the indictment is similar, it fails to allege  that

15  the importation/bringing into the United States was done knowing such to be "contrary to law."  The

16  Supreme Court's reasoning in Liporata v. United States, 471 U.S. 419 (1985) compels section 545 to require

17  a knowing violation of the law.  In Liporata the Supreme Court held that a similarly-worded statute required

18  the government to prove that the violation was done with knowledge of the illegality of the act.  At issue

19  was a violation of 7 U.S.C. § 2024(b)(1)--the welfare fraud statute.  That relevant language of that section

20  provides that, "[W]hoever knowingly uses, transfers, acquires, alters, or possesses coupons or authorization

21  cards in a manner not authorized by this chapter or the regulations issue pursuant to this chapter [shall be

22  punished as follows:]"  7 U.S.C. § 2024(b)(1).  The question for the Court was whether the term

23  "knowingly" in the first part of the statute also modified the term "in a manner not authorized by [the

24  statute] or the regulations."

25         The Court held that the term "knowing" modified both sections of section 2024(b)(1) and required

26  the Government to prove that a defendant knew that the violation was in a manner not authorized by the

27  statute.  Liparota at 433-434.  The Court noted that a strict reading of the statute with no requirement that

28  the defendant know of the illegality of his actions would criminalize "a broad range of apparently innocent

conduct." Id. at 426. Moreover, the Court expressly rejected the Government's argument that the language of another statutory provision of 7 U.S.C. § 2024 evinced Congress' intent to make § 2024(b)(1) a general intent crime. Id. at 429. In fact, a violation of another provision of the same statute provided that "[w]hoever presents, or causes to be presented, coupons for payment or redemption...*knowing* the same to have been received, transferred, or used in any manner in violation of [the statute is subject to fine or imprisonment.] 7 U.S.C. § 2024(c). Despite the fact that the term "knowing" in section 2024(c) was placed directly in front of the terms which required the action to be done in violation of law, the Court found the Government's argument unpersuasive and held that a violation of section 2024(b)(1) also required that the Government prove that the defendant knew of the illegality of his actions. Id.

The reasoning of Liparota applies in the section 545 context. The term knowingly in the statute must also refer to the term, "contrary to law." As Liparota makes clear, it does not necessarily follow that the fact that the first provision of section 545 requires a "fraudulent" violation, that Congress intended for the second provision to be a general intent crime. Indeed, Liparota, is first and foremost a case of statutory construction and the Court rejected the Government's similar arguments in that case. Rather, there is no meaningful way to distinguish section 2024(b)(1) and section 545.

In United States v. Garcia-Paz, 282 F.3d 1212, 1214 (9th Cir. 2002), the Ninth Circuit concluded an essential element of 18 U.S.C. § 545 is that a defendant must "know that he is importing or bringing in 'merchandise contrary to law.'"[10] Garcia-Paz, 282 F.3d at 1217. In Garcia-Paz, the petitioner argued that to be guilty of a violation of section 545, a defendant must know *what* merchandise he is importing (in that case the petitioner asserted he believed he was importing medicine -- it was actually marijuana). The Court rejected this position and held only that a defendant must *know* that the *importation* of that merchandise is "*contrary to law*," not the true nature of the merchandise Id. Thus, the Court found that since "Garcia-Paz knew he was bringing in merchandise contrary to law. . . there was sufficient evidence to support him conviction under section 545." Id. In light of the Ninth Circuit's reading of section 545 in Garcia-Paz, **the**

_____

[10] The Ninth Circuit has previously rejected the contention that the second provision of section 545 is a specific intent crime. United States v. Davis, 597 F.2d 1237 (9th Cir. 1979). Although it holds that the second provision of section 545 is a general intent crime, its reasoning predates Liparota and Garcia-Paz and is therefore unpersuasive.

1    **government must allege in the indictment and prove at trial beyond a reasonable doubt that**

2    **Mr. Rendon-Lara knew his actions during the importation of the merchandise was contrary to law**

3    to support a conviction under 18 U.S.C. § 545.  This reading is consistent with the Fifth Circuit's

4    interpretation of § 545.  In its pattern instructions, the Fifth Circuit lays out the elements as follows: (1) that

5    the defendant imported merchandise into the United States, (2) the importation was contrary to (a specific

6    law) and (3) that the defendant knew the importation was contrary to law.  Pattern Crim. Jury Instr. 5th Cir.

7    § 2.31 (2001).

8    The reasoning of <u>Liparota</u> and the Ninth Circuit's recent discussion of § 545 in <u>Garcia-Paz,</u> requires

9    that a prosecution under section 545 require that the action was undertaken (here, the importation) knowing

10   that it was contrary to law.  Because that is the case, the indictment should have alleged that element.  <u>See</u>

11   <u>United States v. Hill</u>, 279 F.3d 731, 741 (9th Cir. 2002) (holding that, "[i]f an element is necessary to

12   convict then it is also necessary to indict, because elements of an offense do not change is criminal

13   proceedings progress.)  Mr. Rendon-Lara's indictment does not so allege and is therefore defective and must

14   be dismissed.[11]  <u>See United States v. Du Bo</u>, 186 F.3d 1177, 1179-81 (9th Cir. 1999).

15   **C.    This Court Should Dismiss the Indictment for Failure to State an Offense.**

16   The indictment must be dismissed because it fails to state an offense.  It alleges that Mr. Rendon-

17   Lara violated 19 U.S.C. § 1461 by failing to "present[] for inspection and declare[]" the merchandise found

18   in the vehicle.  Mr. Rendon-Lara is being charged with violating section 1461, and thus section 545, by

19   failing to act in a way not required by those sections.

20   The declaration of such merchandise (and, indeed, presentation)  is not required by the 19 U.S.C.

21   § 1461.  Section 1461, <u>Inspection Of Merchandise And Baggage</u>, provides in its entirety:

22   All merchandise and baggage imported or brought in from any contiguous country, except
     as otherwise provided by law or by regulations of the Secretary of the Treasury, shall be
23   unladen in the presence of and be inspected by a customs officer at the first port of entry at
     which the same shall arrive; and such officer may require the owner, or his agent, or other
24   person having charge or possession of any trunk, traveling bag, sack, valise, or other

25

26   _____

     [11] Although the words "knowingly" and "intentionally" appear in the Indictment, they do not attach
27   to the proper elements of the offense given their placement at the beginning of the Indictment, as far
     away as possible from the words "contrary to law."
28

container, or of any closed vehicle, to open the same for inspection, or to furnish a key or other means for opening the same.

Unlike section 545, 19 U.S.C. § 1461 is very specific as to the conduct required to comply with that section. It requires all merchandise and baggage imported or brought in from any contiguous country to be unladen *in the presence of* and *be inspected by* a customs officer at the first port of entry at which the same arrives. According to Merriam-Webster's Collegiate Dictionary, the word "unlade" is a 14th century term which means "to take the load or cargo from." Section 1461 does not create a duty to "present[] for inspection," or  "declare[]" as alleged in the indictment.

In United States v. Davis, 597 F.2d 1237, 1239 (9th Cir. 1979), the Ninth Circuit stated that "[w]e have held that § 1461 places upon the importer the obligation to stop and declare items intended for importation."  The Davis court cites to the case of United States v. Mirenda, 443 F.2d 1351 (9th Cir. 1971) to support this contention.  However, this is *not* Mirenda's holding.  In Mirenda, the court addressed whether there was sufficient evidence to support the defendants' convictions under 21 U.S.C. § 176a (the old marijuana importation statute).  In so doing, the Mirenda court cited section 1461 for the proposition that the person importing the merchandise has the burden of "'unladening the vehicle in the presence of' the customs officer for inspection."  Id. at 1356-57.  The Mirenda court then cited to another regulation, 19 C.F.R. Chapt. 1, part 5, for the proposition that "such merchandise '*shall be listed* on a manifest . . . certified by the person in charge of the vehicle.'"  Id. at 1357 (emphasis added).[12]  At no point in Mirenda does the Court state that section 1461 "places upon the importer the obligation to stop and declare items intended for importation."  Davis is flatly wrong on this point.

Since the government is charging Mr. Rendon-Lara with violating section 1461 by failing to "present[] for inspection" and "declare[]," neither of which is required by section 1461, then the indictment fails to state an offense.

---

[12]  If Mirenda even remotely deals with a duty to declare, it is in the context of this C.F.R. and not section 1461.

**D.    This Court Should Dismiss the Indictment Because it Violates Due Process.**

If this Court finds that section 1461 did place upon Mr. Rendon-Lara a duty to present for inspection and declare the merchandise, then the indictment must be dismissed because it violates due process.  In Batchelder v. United States, 442 U.S. 114 (1979), the Supreme Court stated that "[i]t is a fundamental tenet of due process that '[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.'" 442 U.S. 123 (citation omitted).  It is a violation of Mr. Rendon-Lara's Fifth Amendment right to due process to permit the government to prosecute him under the indictment for failing to "present[] for inspection, and declare[]" merchandise when 19 U.S.C. § 1461 fails to clearly impose upon him either a duty to present the iodine for inspection or declare it.  It violates due process to permit Mr. Rendon-Lara to be at peril of life and liberty based on a constrained reading of the requirements of 19 U.S.C. § 1461.

**E.    Ths Court Should Dismiss the Indictment Because it Is Duplicitous Or, at a Minimum, Compel the Government to Elect.**[13]

**1.    The Law.**

Federal Rule of Criminal Procedure 8(a) prohibits charging two or more offenses in the same count of an indictment.  "Duplicity is the joining of two or more distinct offenses in a single count, so that the general verdict does not reveal exactly which crimes the jury found the defendant committed." United States v. Gomberg, 715 F.2d 843, 845 (3d Cir. 1983).  Combining offenses in one count creates several problems:

> (1) The jury in a general verdict cannot make a finding on each offense; (2) A defendant may not have proper notice of the charges against him; (3) It may be difficult if not impossible

---

[13] Mr. Rendon-Lara is requesting a copy of the transcript of the presentment of this case to the grand jury pursuant to Fed. R. Crim. P. 6(e)(3)(E)(ii) in light of this motion as well.  The transcript is needed to examine the record of what specific instructions were given to the grand jurors relating to their powers, the charges, and necessary elements of the offenses.  The Fifth Amendment Requires that "all elements of the offense [be] considered and found by the grand jury." United States v. Hooker, 841 F.2d 1225, 1230 (4th Cir. 1988) (citing Stirone v. United States, 361 U.S. 212 (1960)).  As discussed above, Mr. Rendon-Lara has filed an attack on the Indictment based in part on faulty grand jury instructions, and seeks to file an additional motion dealing with the specific instructions given to the grand jury in his case.  A transcript of the presentment of the elements of the offense is the only means by which Mr. Rendon-Lara can make his record.

to make correct evidentiary rulings; (4) A jury may convict a defendant without unanimously agreeing on the same offense; (5) A defendant may be prejudiced in a subsequent double jeopardy defense; (6) A defendant may be prejudiced at sentencing; and (7) A defendant may face limited review on appeal.

United States v. Gray, 101 F. Supp. 2d 580, 583 (E.D. Tenn. 2000); see also United States v. Aguilar, 756 F.2d 1418, 1420 n.2 (9th Cir. 1985); United States v. UCO Oil Co., 546 F.2d 833, 835 (9th Cir. 1976).

**2.    The Indictment Is Duplicitous Because It Charges The Separate Offenses Of *Importing* into the United States and *Brining Into* the United States.**

In the one-count indictment, the government alleges that Mr. Rendon-Lara violated 18 U.S.C. § 545 in that he, (1) **imported** into the United States **and** (2) **brought into** the United States certain merchandise. These two phrases have two separate and distinct meanings in § 545 and, given the challenges raised above, it is unclear from which of these two failures to act the alleged violations spring. First, the plain language at § 545 identifying these two phrases is in the disjunctive. See Coronado-Durazo v. I.N.S., 123 F.3d 1322, 1324 (9th Cir. 1997) ("In interpreting statutes, we begin with the language of the statute itself"). An "or" separates them rather than an "and". This choice of statutory language has significance. Cf. Davis, 597 F.2d at 1239 (holding that "by its own clear terms," the second paragraph of § 545 is written in the disjunctive with regard to whether defendant "knowingly" or "fraudulently" imported merchandise in violation of law); see also Sandpiper Village Condominium Ass'n., Inc. v. Louisiana-Pacific Corp., 428 F.3d 831, 844 (9th Cir. 2005) ("We are not inclined to construe the Anti-Injunction Act in that way, as it would render one of the exceptions redundant and the use of the disjunctive "or" in the statute irrelevant, in violation of the familiar canon that cautions against such a reading) (citing Mackey v. Lanier Collection Agency & Serv., Inc., 486 U.S. 825, 837 (1988)).

Second, the Ninth Circuit in Olais, which discussed the "essential elements of an offense under the [] relevant portions of the second paragraph of section 545", specifically identified the second element disjunctively as "imported **or** brought into the United States." 416 F.2d at 1158 (emphasis added). It never identified the terms in the second element as conjunctive or capable of being charged simultaneously in the same count. In fact, just the opposite conclusion must be drawn in light of the Court's subsequent decision in United States v. Patel, 762 F.2d 784 (9th Cir. 1985). Patel affirmed the propriety of a jury instruction

1  given in a trial for a violation of § 545, specifically an instruction defining what "unlawful importation"

2  meant in the context of an international coffee agreement. Id. at 790. As the Court indicated, this phrase

3  was pertinent to the second element of a § 545 offense. Id. In affirming the special instruction, the Court

4  relied upon the essential elements identified in Olais. Id. Crucially for purposes of the instant motion, the

5  Court also approved the district court's jury instruction on the second element of § 545. Id. That instruction

6  told jurors that "Element Two required the jury to find that 'the defendants unlawfully imported coffee into

7  the United States on or about the date specified in the indictment.' " Id. If the second element was intended

8  to be read in the conjunctive, i.e., required charging and instructing on both importing and bringing into the

9  United States, instructing the jury only upon the importation rather than both the importation and bringing

10  into the United States of coffee would have been error. The Court, however, did not find any error in the

11  instruction. Id.

12       The indictment, therefore, is duplicitous in that it alleges two distinct offenses, importing *and*

13  bringing merchandise into the United States. "An indictment is duplicitous where a single count joins two

14  or more distinct and separate offenses." United States v. Martinez-Ramirez, 273 F.3d 903, 913 (9th Cir.

15  2001) (citation omitted). Accordingly, the indictment should be dismissed.

16       Currently, it is difficult for Mr. Rendon-Lara to prepare a defense because of ambiguity caused by

17  the indictment's duplicitous nature. If the court does not dismiss the indictment, Mr. Rendon-Lara requests

18  that this Court compel the government to elect from among the violations. This is required in order for

19  Mr. Rendon-Lara to adequately prepare his defense and to avoid the "vice . . . that a jury may find

20  [Mr. Rendon-Lara] guilty without having reached a unanimous verdict on the commission of a particular

21  offense." Martinez-Ramirez, 273 F.3d at 913 (citation and internal quotations omitted).

22       **3.    The Indictment Is Duplicitous Because It Charges The Separate Offenses Of Failing to *Present* and Failing to *Declare*.**

23

24       In the one-count indictment, the government also alleges that Mr. Rendon-Lara violated 18 U.S.C.

25  § 545 in that he, (1) **failed to present** for inspection and (2) **failed to declare** the merchandise. The

26  government references a violation of 19 U.S.C. § 1461. Again, given the challenges raised above, it is

27  unclear from which of these two failures to act the alleged violations spring. The indictment, therefore, is

28

1    duplicitous in that it alleges two distinct offenses, failing to present and failing to declare.  See Martinez-

2    Ramirez, 273 F.3d at 913. Accordingly, the indictment should be dismissed for this reason as well.

3    The duplicitous nature of this allegation, too, makes it difficult for Mr. Rendon-Lara to prepare a

4    defense because of ambiguity caused by the indictment.  As requested above, if the court does not dismiss

5    the indictment, Mr. Rendon-Lara requests that this Court compel the government to elect from among the

6    violations so that he can adequately prepare his defense and to avoid the "vice . . . that a jury may find

7    [Mr. Rendon-Lara] guilty without having reached a unanimous verdict on the commission of a particular

8    offense." Id.

9                                              **VII.**

10  **THE "TO WIT, APPROXIMATELY 102.85 KILOGRAMS (APPROXIMATELY 226.27**
     **POUNDS) OF IODINE" LANGUAGE CONTAINED IN THE INDICTMENT MUST BE**
11  **STRICKEN AS SURPLUSAGE**

12   Rule 7(d) of the Federal Rules of Criminal Procedure provides that upon the defendant's motion the

13  court may "strike surplusage from the indictment or information."  Surplusage is any part of an indictment

14  that is "unnecessary to and independent of the allegations of the offense [and] may normally be treated as

15  a 'useless averment' that 'may be ignored.'"  United States v. Miller, 471 U.S. 130, 136 (1985) (quoting

16  Ford v. United States, 273 U.S. 593, 602 (1927)).

17   The "to wit, approximately 102.85 kilograms (approximately 226.27 pounds) of iodine" language

18  contained in the Indictment is surplusage because it is not an element of the offense charged.  The Ninth

19  Circuit's holding in Garcia-Paz makes this clear.  There, the Court expressly held that "inclusion of the 'to

20  wit' phrase in the indictment was mere surplusage . . . ."  Garcia-Paz, 282 F.3d at 1215-16.  The Court went

21  on to explain that "section 545 prohibits smuggling of 'merchandise.'  18 U.S.C. § 545.  Whether that

22  merchandise is illegal medicine or marijuana does not matter under the statute.  Thus, the phrase 'to wit,

23  marijuana' is surplusage . . . ."  Id. at 1217.  Accordingly, there can be no question in this case whether the

24  "to wit" language can remain in the Indictment.  It is necessary to strike surplusage from indictments to

25  protect the accused "against prejudicial allegations that are neither relevant nor material to the charges made

26  in [the] indictment . . . ."  United States v. Poore, 594 F.2d 39, 41(4th Cir. 1979) (district court's refusal to

27  strike defendant's prior felony conviction from indictment was abuse of discretion).  See also, United States

28

1    v. Freeman, 619 F.2d 1112 (5th Cir. 1980) (striking phrases like "among other things" and "included, but

2    not limited to" from the indictment because they improperly indicate additional illegal conduct).

3        The "to wit" language has no legal effect in the Indictment.  It is immaterial, prejudicial, and should

4    therefore be stricken.  The Indictment presents them as if they are actual elements of the charged offense

5    even though the government need not prove these allegations to obtain a conviction for the offense charged.

6    The inclusion of the allegations serves only to confuse the nature of the actual offense and  prejudice the

7    jury.  Accordingly, the "to wit" language should be stricken from the Indictment as surplusage.

8                                             **VIII.**

9            **THE COURT MUST SUPPRESS STATEMENTS MADE BY MR. RENDON-LARA**

10   **A.      Interrogation Occurred Subsequent to Mr. Rendon-Lara *Unequivocally* Invoking His
             Right to an Attorney.**

11

12        The Supreme Court's holding in Miranda v. Arizona, 384 U.S. 436 (1966), provides that the

13   prosecution may not use statements, whether exculpatory or inculpatory, stemming from a custodial

14   interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure

15   the privilege against self-incrimination.  Id. at 444.  In Dickerson v. United States, 530 U.S. 428 (2000), the

16   Supreme Court held that Miranda rights are no longer merely prophylactic, but are of constitutional

17   dimension.  Id. at 2336 ("we conclude that Miranda announced a constitutional rule").

18        Once a person is in custody, Miranda requires that warnings must be given prior to any interrogation.

19   See United States v. Estrada-Lucas, 651 F.2d 1261, 1265 (9th Cir. 1980).  Those warnings must advise the

20   defendant of each of his or her "critical" rights.  United States v. Bland, 908 F.2d 471, 474 (9th Cir. 1990).

21   Prior to the Miranda warning and waiver of those rights, the police have *no right* to question the suspect.

22   See Miranda, 384 U.S. at 471 (emphases added).  Furthermore, Miranda requires that, once "the individual

23   indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the

24   interrogation must cease." Id. at 473-74 (emphasis added); United States v. Rodriguez-Gastelum, 569 F.2d

25   482, 487 (9th Cir. 1978).  Similarly, "[i]f the individual states that *he wants an attorney*, the interrogation

26   must cease *until an attorney is present*." Miranda, 384 U.S. at 474 (emphases added).  "These commands

27   are clear on their face." California Attorneys for Criminal Justice v. Butts, 195 F.3d 1039, 1041 (9th Cir.

28

                                           30                          08cr1367-JLS

1999).  The Supreme Court's holding in Miranda could scarcely be more clear in stating that, once a suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease," and that if he "states that *he wants an attorney*, the interrogation *must cease* until an attorney is present."  Id. at 1047 (quoting Miranda, 384 U.S. at 473-74) (emphases added).  When an accused invokes his right to have counsel present during custodial interrogation, he may not be subjected to further questioning by the authorities until a lawyer has been made available or the suspect himself reinitiates conversation.[14]  Edwards v. Arizona, 451 U.S. 477, 484-85 (1981); see also Davis v. United States, 512 U.S. 452, 458 (1994) ("if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation"); Smith v. Illinois, 469 U.S. 91, 94-95 (1984) (same); McNeil v. Wisconsin, 501 U.S. 171, 176 (1991) (same); Minnick v Mississippi, 498 U.S. 146, 150-52 (1990) (same).

The rule under these decisions is unmistakable and, as set forth by the seminal case of Edwards, is "designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights."  Michigan v. Harvey, 494 U.S. 344, 350 (1990).  The Ninth Circuit in Smith v. Endell, 860 F.2d 1528 (9th Cir. 1988), characterized the prohibition on interrogation post-attorney invocation as follows:

> The Supreme Court has repeatedly emphasized that the Edwards rule is a "rigid," "bright line," "per se" rule.  The conduct it prohibits is not wrongful in itself.  The purpose of the rule is wholly prophylactic: "By prohibiting further interrogation after the invocation of these rights, we erect an auxiliary barrier against police coercion."  [Connecticut v.] Barrett, 107 S.Ct. [828] at 832 [1987].

Id. at 1532.  The "rigid prophylactic rule" of Edwards requires a court to "determine whether the accused actually invoked his right to counsel."  Smith, 469 U.S. at 95.  The determination whether an accused actually invoked his right to counsel is "an objective inquiry."  Davis, 512 U.S. at 458-59.  The suspect must "unambiguously request counsel."  Id. at 459.  "Although a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable

[14]  A suspect initiates further communication of his own accord only when he "evince[s] a willingness and a desire for a generalized discussion about the investigation."  Oregon v. Bradshaw, 462 U.S. 1039, 1045-46 (1983).  Accordingly, "[t]he crucial factors [a]re whether [] interrogation was initiated by [a defendant] . . . and, whether such initiation was voluntary . . . ."  Anderson v. Terhune, 516 F.3d 781796 (9th Cir. 2008).

police officer in the circumstances would understand the statement to be a request for an attorney." Id.; see also McNeil v. Wisconsin, 501 U.S. 171, 178 (1991) ("Invocation of counsel sufficient to trigger the protections of Edwards 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' ").

The government in this case did not "scrupulously honor" Mr. Rendon-Lara's invocation of his right to an attorney, thereby violating his due process rights.    As the attached partial-transcription of the interrogation session indicates, Mr. Rendon-Lara expressly, unequivocally and unambiguously told the agents he wanted an attorney:

> Yes, I need, I do want, I want an attorney.

See Exhibit A at 3.[15]  No statement by anybody in custody facing interrogation could be clearer on its face than this one.[16]   Agent Sanchez herself tells the English speaking agent later during the interrogation "[Mr. Rendon-Lara] just said he wanted a lawyer, when he read that one [right] he said, oh, I should have a lawyer, he said." Id. at 4.  This interview, much less any questioning by the agents, thus, should have

---

[15]  Even Mr. Rendon-Lara's earlier statement, "Wee, it would be good, wouldn't it, to have attorney with me," would suffice to invoke the right to counsel.  See Exhibit A at 3.

[16]  It would be inconceivable how the government could claim this statement was somehow ambiguous or equivocal.  The Ninth Circuit has found less clear, more ambiguous statements by defendants facing interrogation sufficient invoke the right to an attorney and preclude interrogation.  See e.g., Paulino v. Castro, 371 F.3d 1083, 1087 (9th Cir. 2004) ("[w]here's the attorney" and "[y]ou mean it's gonna take him long to come?" not unambiguous requests for counsel); Clark v. Murphy, 331 F.3d 1062, 1071 (9th Cir. 2003) ("I think I would like to talk to a lawyer" not an unambiguous request for counsel); United States v. Doe, 170 F.3d 1162, 1166 (9th Cir.1999) ("[w]hat time will I see a lawyer?" not an unambiguous request for counsel); United States v. de la Jara, 973 F.2d 746, 750 (9th Cir. 1992) (deeming "Can I call my attorney?" or "I should call my lawyer" a clear invocation of the right to counsel); Robinson v. Borg, 918 F.2d 1387, 1389 (9th Cir.1990) (deeming "I have to get me a good lawyer, man. Can I make a phone call?" a clear invocation of the right to counsel); Shedelbower v. Estelle, 885 F.2d 570, 571-73 (9th Cir.1989) (deeming "You know, I'm scared now. I think I should call an attorney" a clear invocation of the right to counsel); Smith v. Endell, 860 F.2d 1528, 1529-31 (9th Cir. 1988) (deeming "Can I talk to a lawyer?" a clear invocation of the right to counsel).  The Supreme Court has as well.  See Smith, 469 U.S. at 97 (deeming a suspect's statement, "Uh, yeah, I'd like to do that," upon hearing of his right to counsel a clear invocation).

ended as soon as Mr. Rendon-Lara said "Yes, I need, I do want, I want an attorney."[17]  The lead agent's statements make clear his invocation was unambiguous and unequivocal.  The agents, however, decided to continue with the interview and interrogate Mr. Rendon-Lara.  Suppression is not only warranted, but mandated.

Crucially, it is clear that *the agents* chose to continue the interview and interrogation by continuing to talk with Mr. Rendon-Lara.  See Exhibit A.  Furthermore, there was never any break in the interrogation.[18]  Agent Sanchez tells Mr. Rendon-Lara immediately after his invocation mid-Miranda "Okay, but right now I just need your initials if you understand the right."  Id. at 3.  The interview and interrogation then continue unabated with the agent completing Miranda warnings, telling Mr. Rendon-Lara about what was found, having him waive his rights, and then questioning him about the events leading to arrest.  Id.  At one point soon after finishing the rights and soon after Mr. Rendon-Lara's invocation, Agent Sanchez tells him "but we want to know, what, what you [can] tell us about that."  Id. at 4.  Mr. Rendon-Lara did not re-initiate the interview, which is key to discerning error on the part of the interrogating agents.  See infra note 14.  But for the agents' continuing to press Mr. Rendon-Lara to speak with them, he would have consulted with an attorney prior to questioning.

Because Mr. Rendon-Lara's statements were the product of post-invocation custodial interrogation, the Court must suppress those statements as well as any derivative fruits, i.e., evidence discovered by the government as a result of the knowledge it obtained through the illegal interrogation of Mr. Rendon-Lara.[19]

---

[17]  Whether the invocation occurred midstream of Miranda warnings is irrelevant.  See Taylor v. Maddox, 366 F.3d 992, 1014-1015 (9th Cir. 2004).  In Taylor, a habeas case reviewing for error under a clearly erroneous standard, the Court held that invoking the right to counsel even *prior* to administering Miranda precludes any custodial interrogation.  Id.  "Because Taylor asked to speak with counsel prior to the start of questioning, the detectives should never have started their custodial interrogation at all."  Id.  Repeated and completed administration of Miranda warnings to the defendant at the start of questioning and again on the tape-recording was of no consequence and did not rescue the statements from a violation of Edwards.  Id. at 1015.

[18]  Counsel can submit for the Court's review a copy of the videotaped interrogation.

[19]  This would include any alleged consent to search Mr. Rendon-Lara's cellular telephone(s).  Nonetheless, he makes a Fourth Amendment motion to suppress below to preserve his record.

1  **B.    Any Subsequent Waiver of Miranda Rights as Well as Any Statements by Mr. Rendon-Lara Are Presumed Involuntary Because They Were Made After His Invocation of His Right to Counsel.**

2

3    Mr. Rendon-Lara's purported waiver of Miranda rights, which occurred only subsequent to his

4  repeated requests for an attorney and which the agents ignored, must be presumed involuntary.  According

5  to Minnick, Edwards stands as a solitary exception to the Supreme Court's waiver jurisprudence as guided

6  by Johnson v. Zerbst, 304 U.S. 458 (1938).  498 U.S. at 160.  "Edwards . . . broke with th[e] approach [in

7  Zerbst], holding that a defendant's waiver of his Miranda right to counsel, made in the course of a police-

8  initiated encounter after he had requested counsel but before counsel had been provided, was *per se*

9  involuntary."  Minnick, 498 U.S. at 160 (emphasis added).  Minnick clearly controls in this case and any

10  purported waiver is per se involuntary.

11    Additionally, assuming there to be any difference from a waiver, Mr. Rendon-Lara's statements in

12  response to interrogation after the purported waiver are presumed involuntary because they were responses

13  to police questioning following an invocation of the right to counsel.  See McNeil v. Wisconsin, 501 U.S.

14  171, 177 (1991) ("If the police do subsequently initiate an encounter in the absence of counsel (assuming

15  there has been no break in custody), the suspect's statements are presumed involuntary and therefore

16  inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements

17  would be considered voluntary under traditional standards.").

18    The reason the waiver and statements must be presumed involuntary is "to prevent police from

19  badgering a defendant into waiving his previously asserted Miranda rights [. . .]"  Id. (citing Michigan v.

20  Harvey, 494 U.S. 344, 350 (1990)).  Because Mr. Rendon-Lara had previously asserted his Miranda rights,

21  his waiver and statements must be presumed involuntary.  McNeil, 501 U.S. at 177.

22  **C.    Mr. Rendon-Lara Requests A § 3501 Evidentiary Hearing Prior to Trial.**

23    The government may argue that it does not intend to introduce Mr. Rendon-Lara's statements except

24  in its rebuttal case.  Because the waiver and statements are presumed involuntary, 18 U.S.C. § 3501

25  precludes their admissibility entirely, whether case-in-chief or rebuttal.  Nonetheless, assuming the Court

26  disagrees with the conclusion that any waiver or statements are per se involuntary, Mr. Rendon-Lara

27  requests a hearing pursuant to 18 U.S.C. § 3501(a), to determine, outside the presence of the jury, whether

28

any waiver or statements made by him were voluntary.  Further, Mr. Rendon-Lara requests that the determination as to the admissibility of these statements occurs *before* trial.  Their admissibility is critical to Mr. Rendon-Lara's decision to testify.  Because there is a serious question as to their voluntariness, if the court does not exclude them on voluntariness grounds based upon this motion and the attached exhibits, Mr. Rendon-Lara requests an evidentiary hearing on their admissibility before trial.  Failure to do so would impinge upon his right to testify.  See New Jersey  v. Portash, 440 U.S. 450 (1979).  Further, if the statements were only introduced in rebuttal, this would prejudice Mr. Rendon-Lara's right to present a complete defense, because he would not be allowed to argue their voluntariness to the jury in his case-in-chief.  See Crane v. Kentucky, 476 U.S. 683, 690 (1986) (error to preclude defendant from arguing voluntariness of statements to jury).

**IX.**

## THE COURT SHOULD SUPPRESS THE INFORMATION DERIVED FROM THE SEARCH OF THE CELLULAR TELEPHONE WITHOUT A WARRANT

The Fourth Amendment of the United States Constitution protects "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  Warrantless searches are per se unreasonable under the Fourth Amendment subject to only a few specifically established and well delineated exceptions.  Mincey v. Arizona, 437 U.S. 385, 390 (1978).  According to discovery disclosed to defense counsel, agents recovered at least one cellular telephone subsequent to arrest.  Sometime thereafter, and at the least during interrogation, agents searched the memory of that cellular telephone and discovered various names and telephone numbers.  The government may seek to admit such evidence at trial.  The Court should preclude the government from doing so because the warrantless search of the telephone's memory violated Mr. Rendon-Lara's Fourth Amendment rights.

First, this search occurred without a warrant and without Mr. Rendon-Lara's voluntary consent.  The government has the burden of proving by clear and positive evidence that an unequivocal and specific consent was given, uncontaminated by any duress or coercion.  See Channel v. United States, 285 F.2d 217, 219, 220 (9th Cir. 1960); Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973); Bumper v. North Carolina, 391 U.S. 543, 548 (1968).  In United States v. Chan-Jimenez, 125 F.3d 1324 (9th Cir. 1997), the Court

summarized the government's burden and factors to be taken into account in determining the voluntariness of consent: "[i]n order to establish the validity of a consent to search, the government bears the heavy burden of demonstrating that the consent was freely and voluntarily given. Whether consent to search was voluntarily given or not is 'to be determined from the totality of the circumstances.'" Id. at 1327 (quoting Schneckloth v. Bustamonte, 412 U.S. at 227); see United States v. Torres-Sanchez, 83 F.3d 1123, 1129 - 1130 (9th Cir. 1996); United States v. Al-Azzawy, 784 F.2d 890, 895 (9th Cir.1985), cert. denied, 476 U.S. 1144 (1986); United States v. Alfonso, 759 F.2d 728, 740 (9th Cir.1985).

The Ninth Circuit has held that this Court should consider the following factors in determining whether a consent to search is voluntary: (1) whether the person was in custody; (2) whether the officer had his weapon drawn; (3) whether the officers failed to administer Miranda warnings; (4) whether the officer informed the person of his right to refuse consent; and, (5) whether the person was told that a search warrant could be obtained. See Chan-Jiminez, 125 F.3d at 1327; United States v. Welch, 4 F.3d 761, 763 (9th Cir. 1993); United States v. Castillo, 866 F.2d 1071, 1082 (9th Cir.1988). Using the five factors in Chan-Jiminez, Welch and Castillo as a guide to determine the voluntariness of a consensual search, it becomes quite clear that the facts of the instant case (discussed above) demonstrate that any purported consent to the search of the telephone was not voluntary, even assuming any was given. Because the search was without a warrant, and without his voluntary consent, and because no other exception to the warrant requirement applies, Mr. Rendon-Lara's demands that any evidence seized as a result of this search be suppressed.

## X.

## MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS

Defense counsel requests leave to file further motions and notices of defense based upon information gained in the discovery process as well as defense investigation.

///

///

///

///

///

**XI.**

**<u>CONCLUSION</u>**

     For these and all the foregoing reasons, the defendant, Mr. Rendon-Lara, respectfully requests that this Court grant his motions and grant any and all other relief deemed proper and fair.

                          Respectfully submitted,

                          */s/ Jason I. Ser*

DATED: August 1, 2008              JASON I. SER
                          Federal Defenders of San Diego, Inc.
                          Attorneys for Mr. Rendon-Lara
                          E-mail:  jason_ser@fd.org